## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXIS LARA | : | CIVIL ACTION |
| Plaintiff, | : | NO. |
| -vs- | : | |
| | : | |
| SAMUEL ADAMS PENNSYLVANIA | : | PLAINTIFF REQUESTS |
| BREWERY COMPANY, LLC *individually* | : | |
| *and d/b/a* SAMUEL ADAMS, SAMUEL | : | |
| ADAMS BREWERY COMPANY LTD, | : | |
| SAMUEL ADAMS PENNSYLVANIA | : | |
| BREWERY COMPANY, SAMUEL | : | |
| ADAMS, HTSS, INC., KEVIN MOYER | : | |
| (*individually*), EDWIN (last name unknown): | | |
| (*individually*), QUINCY TROUPE | : | |
| (*individually*), DERRICK (last name | : | |
| unknown) (*individually*), BILL (last name | : | |
| unknown) (*individually*), ALISON GLEN | : | |
| (*individually*), LEWIS MARS | : | |
| (*individually*), | : | |
| | : | TRIAL BY JURY |
| Defendants. | : | |

Plaintiff, Alexis Lara, by and through undersigned counsel hereby files this Civil Action

Complaint against Defendants, Samuel Adams Pennsylvania Brewery Company, LLC

*individually and d/b/a* Samuel Adams, Samuel Adams Brewery Company Ltd, Samuel Adams

Pennsylvania Brewery Company, Samuel Adams, HTSS, Inc., Kevin Moyer, *individually,* Edwin

(last name unknown), *individually,* Quincy Troupe, *individually,* Derrick (last name unknown),

*individually,* Bill (last name unknown), *individually,* Alison Glen, *individually,* Lewis Mars,

*individually* (collectively "Defendants") and upon information and belief avers the following:

## I.   **PARTIES**

1.     Plaintiff, Alexis Lara ("Plaintiff" or "Mr. Lara") is an adult individual who resides

in the Commonwealth of Pennsylvania.

1

2.      Plaintiff, Alexis Lara is a thirty-five (35) year old male of Hispanic descent.

3.      Defendant, Samuel Adams Pennsylvania Brewery Company, LLC *individually and d/b/a* Samuel Adams is a business organization existing under the laws of the Commonwealth of Pennsylvania with an office located for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

4.      Defendant, Samuel Adams Brewery Company Ltd is a business organization existing under the laws of the Commonwealth of Pennsylvania with an office located for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 1803.

5.      Defendant, Samuel Adams Pennsylvania Brewery Company is a business organization existing under the laws of the Commonwealth of Pennsylvania with an office located for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

6.      Defendant, Samuel Adams is a business organization existing under the laws of the Commonwealth of Pennsylvania with an office located for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

7.      Defendant, HTSS, Inc. is a business organization existing under the laws of the Commonwealth of Pennsylvania with an office located for the purposes of correspondence at 3630, 860 Broad St. #111, Emmaus, Pennsylvania 18049.

8.      Defendant, Kevin Moyer is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

9.      At all times relevant to this Complaint, Kevin Moyer was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

10.     Defendant, Edwin is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 3630, 860 Broad St. #111, Emmaus, Pennsylvania 18049.

11.     At all time relevant to this Complaint, Edwin was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

12.     Defendant, Quincy Troupe is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

13.     At all time relevant to this Complaint, Quincy Troupe was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

14.     Defendant, Derrick (last name unknown) is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

15.     At all time relevant to this Complaint, Derrick was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

16.     Defendant, Bill (last name unknown) is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

17.     At all times relevant to this Complaint, Bill was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

18.     Defendant, Alison Glen is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

19.     At all times relevant to this Complaint, Alison Glen was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

20.     Defendant, Lewis Mars is an adult individual who resides in the Commonwealth of Pennsylvania with a business address for the purposes of correspondence at 7880 Penn Drive, Breinigsville, Pennsylvania 18031.

21.     At all times relevant to this Complaint, Lewis Mars was employed by Defendants and held supervisory authority over Plaintiff, Alexis Lara.

22.     At all times relevant to this Complaint Samuel Adams Pennsylvania Brewery Company, LLC *individually and d/b/a* Samuel Adams, Samuel Adams Brewery Company Ltd, Samuel Adams Pennsylvania Brewery Company, Samuel Adams (collectively "Samuel Adams"), and HTSS, Inc., ("HTSS"), was Plaintiff, Alexis Lara's joint and sole employer. Plaintiff was hired through a staffing agency, to wit, Defendant, HTSS, Inc., and was placed at the Samuel Adams Brewery located in Breinigsville, Pennsylvania.   Plaintiff was hired by and received a paycheck from HTTS, Inc., however, the day to day assignments and job responsibilities Plaintiff carried out were controlled by Samuel Adams.   Plaintiff was trained, overseen, and worked exclusively with Samuel Adams during all relevant periods. Samuel Adams controlled Plaintiff's schedule, lunch breaks, start time, finish time, and diciplinary matter.   The reason for Plaintiff's termination was mere pretext, however, the proffered reason Defendant, Samuel Adams has offered for Plaintiff's termination was violation of a Samuel Adams policy.   Moreover, Plaintiff was terminated as a direct result of attempting to report discrimination and harassment to which Plaintiff was subjected by Samuel Adams employees including a Samuel Adams supervisor who had the authority to take a tangible employment action against Plaintiff.

## II.   NATURE OF THE CASE

23.     Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 20003-17 (amended in 1972, 1978, by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"); 42 USC Section 1981; and the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et. seq.* ("PHRC"), under the laws of the Commonwealth of Pennsylvania and seeks damages to redress injuries Plaintiff suffered as a result of Defendants' discrimination, harassment, retaliation. Accordingly, Plaintiff brings this Civil Action to redress injuries Plaintiff suffered as a direct result of violations of federal laws and the laws of the Commonwealth of Pennsylvania and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of Plaintiff's race and Defendants' retaliation when Plaintiff reported and opposed Defendants discriminatory conduct.

## III.   JURISDICTION AND VENUE

24.     This action involves a Question of Federal Law under 42 USC Section 1981 and Title VII of the Civil Rights Act of 1964.   The honorable Court also has supplemental jurisdiction over the Commonwealth Law and Municipal Law Causes of Action.

25.     Venue is proper in the Eastern District of Pennsylvania as Plaintiff was employed by Defendants and worked in Montgomery County in the Commonwealth of Pennsylvania where the discrimination, harassment complained of occurred.

26.     On or around March 15, 2019, Plaintiff, Alexis Lara filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants as set forth herein.   Plaintiff's Charge of Discrimination was dual filed with the Pennsylvania Human Relations Commission.

27.     Plaintiff, Alexis Lara claims under the Pennsylvania Human Relations Act will be ripe for suit one (1) year after Plaintiff's Charge of Discrimination was dual filed with the Pennsylvania Human Relations Commission ("PHRC").   Plaintiff's Charge was dual filed with the PHRC March 15, 2019.   Accordingly, Plaintiff plans to amend his Complaint and add additional counts under the Pennsylvania Human Relations Act sometime after March 15, 2020.

28.     On or about December 1, 2019, the EEOC issued and sent by mail a Dismissal and Notice of Rights to Plaintiff which required that Plaintiff file a civil action within ninety (90) days of receipt of the Dismissal and Notice of Rights.

29.     This action is hereby commenced within ninety (90) days of receipt of the Dismissal and Notice of Rights.

## IV.   MATERIAL FACTS

30.     Plaintiff, Alexis Lara ("Mr. Lara" or "Plaintiff") began his employment for Defendant s in March 2018.   Mr. Lara began working for Defendant, Samuel Adams Pennsylvania Brewery Company, LLC individually and d/b/a Samuel Adams, Samuel Adams Brewery Company Ltd, Samuel Adams Pennsylvania Brewery Company, Samuel Adams, (collectively "Samuel Adams") through a staffing agency, HTSS, Inc.

31.     Mr. Lara was hired by Samuel Adams through HTSS, Inc. as a general warehouse packager and began his employment sometime in March 2018. Mr. Lara continued his employment for Defendants until his unlawful termination eight (8) months sometime around December 13, 2018.

32.     At all times material to this Complaint, Plaintiff Alexis Lara was qualified for his position with Defendants and satisfied the job requirements of his position.

33.     At the time of his termination there were no issues concerning the quality of Mr. Lara's job performance.

34.     Mr. Lara never receive a verbal or written warning for discipline or any other reason during his employment for Defendants until his unlawful termination when Mr. Lara was accused of wearing headphones on the warehouse floor.

35.     The reason for Mr. Lara's termination was nothing more than pretext. At no time did Mr. Lara wear headphones on the warehouse floor.

36.     In fact, Plaintiff did nothing to warrant his abrupt and unlawful termination on or around Thursday, December 13, 2018.

37.     Plaintiff's termination came within days of Plaintiff's continued reports of discrimination and harassment in the workplace.   The temporal proximity between Plaintiff's reports of discrimination and harassment in the workplace and Plaintiff's abrupt, termination suggests Defendants' unlawful discriminatory, retaliatory motives.

38.     While employed for Defendant, Plaintiff Alexis Lara was forced to wear a yellow hard hat to signify that he was a "yellow hat" employee.

39.     All temporary employees were forced to wear yellow hats.

40.     Defendants referred to the temporary employee workforce which was largely comprised of Hispanic individuals as the "yellow hats."

41.     Almost every temporary employee was of Hispanic or African American descent.

42.     Defendants' full-time employees was comprised of white Caucasian workers. The white, Caucasian workers were referred to as "white hats."

43.    Accordingly, the Hispanic employees were the yellow employees called the "yellow hats" and the white Caucasian employees were the white employees called the "white hats."

44.    On November 29, 2018 at 5:30 AM, all warehouse packaging employees were gathered for the daily morning meeting conducted by Samuel Adams and Samuel Adams supervisory employees, including Defendant, Kevin Moyer.

45.    The yellow hats and the white hats were segregated so that Hispanic employees were segregated from white, Caucasian employees.

46.    Plaintiff, Alexis Lara entered the room for the morning meeting and sat at a table designated for the "yellow hats."

47.    Mr. Lara then heard a white, Caucasian woman (a "white hat") clearly say, "I am tired of HTSS hiring all these blacks and Puerto Ricans."

48.    The white hat employee who made this discriminatory, race-based comment was speaking to three Caucasian males (white hats).

49.    Plaintiff, Alexis Lara heard one of these Caucasian males ask the women, "Are you a racist?" to which the woman responded, "Yes."

50.    Plaintiff, Alexis Lara was stunned, insulted and mortified at the women's blatant racist remarks in the workplace.

51.    Plaintiff, Alexis Lara asked the woman, "Did you just say you are racist?"

52.    The woman responded to Plaintiff, Alexis Lara: "Yes."

53.    Plaintiff, Alexis Lara raised his hand and notified Defendant, Kevin Moyer about the racist and derogatory remarks.

54.     Defendant, Kevin Moyer is a Samuel Adams employee with supervisory authority over Plaintiff, Alexis Lara.

55.     The previous day, a yellow hat employee was escorted from the property and terminated for making a race-based remark.

56.     Plaintiff, Alexis Lara reminded Defendant, Kevin Moyer about this morning meeting from the previous day, when a "yellow hat" employee was escorted from the property.

57.     The remark made by the yellow hat the previous day was significantly less offensive than the white hat's remark, that she is tired of working with blacks and Hispanics and that she is racist.

58.     During a morning meeting the day before, sometime around November 28, 2018, Defendants addressed the instance where a yellow hat made a race-based remark.

59.     Defendants informed all present including the entire workforce that day that there was a zero-tolerance policy for race-based remarks.

60.     Defendants enforcement of this stated policy was discriminatory as Defendants refused to enforce the policy when a white hat subjected a yellow hat to discrimination and harassment in the workplace.

61.     Despite the previous incident and the announcement the day before, Defendant Kevin Moyer and Defendant Edwin refused to acknowledge Plaintiff, Alexis Lara's report of the white hat's race-based, discriminatory comment; which was made in front of  the entire staff during the morning meeting.

62.     It would have been very easy for Defendant, Kevin Moyer and Defendant, Edwin to identify the white hat and confirm the race-based discriminatory remark.   However, because

it was a yellow hat accusing a white hat, Defendants refused to take any action Plaintiff was terminated less than two (2) weeks later.

63.     After the morning meeting, Plaintiff Alexis Lara observed the same group of white hats who sat at the table where the discriminatory remark was made.

64.     After the meeting, Plaintiff observed the white hats and the women who made the discriminatory, race-based remark quickly approach Defendant Kevin Moyer.

65.     It appeared to Plaintiff, Alexis Lara that the white hats approached Defendant, Kevin Moyer to discuss Plaintiff's report of the discriminatory comment.   Accordingly, Plaintiff also walked over to talk with Defendant, Kevin Moyer.

66.     Plaintiff, Alexis Lara approached Defendant Kevin Moyer after the meeting. Defendant, Kevin Moyer was already talking with the white hats who sat at the table where the race-based remark was made.

67.     Defendant Kevin Moyer refused to acknowledge Plaintiff, Alexis Lara until the white hat employees finished talking.

68.     After the white hat employees finished talking to Defendant, Kevin Moyer, Plaintiff, Alexis Lara moved closer to Defendant Kevin Moyer. Plaintiff, Alexis Lara believed that Defendant Keven Moyer would want to talk to him, por have questions about the report of discrimination and harassment that had just taken place at the morning meeting.

69.     The individual who made the discriminatory remark was employee, Diana Rivas.

70.     Before Plaintiff, Alexis Lara has the opportunity to say anything, Defendant Kevin Moyer yelled at Plaintiff, Alexis Lara.

71.     Yelling, Defendant Kevin Moyer accused Mr. Lara of interrupting the morning meeting to report discrimination and harassment in the workplace.

72.     Then Defendant, Kevin Moyer stated: "You were not even sitting at their table so you could not have known what was said."

73.     Before Plaintiff could say anything, Defendant, Kevin Moyer verbally disciplined Plaintiff and then argued that Plaintiff's report must have been false.

74.     Defendant, Kevin Moyer's reaction to Plaintiff simply approaching Defendant, Kevin Moyer was in violation of Defendants so-called antidiscrimination and harassment policy.

75.     Plaintiff was not afforded the opportunity to even explain what had transpired before, Defendant, Kevin Moyer subjected Plaintiff to verbal discipline and arguments on behalf of the white hat, Diana Rivas.

76.     Then Defendant, Kevin Moyer stated: "She could have been joking. I already spoke to her."   Accordingly, Defendant, Kevin Moyer's third comment was also in defense of the race-based discriminatory remark.

77.     Before Plaintiff, Alexis Lara could even talk, Defendant, Kevin Moyer had issued verbal discipline to Plaintiff, Alexis Lara for making the report, notified Plaintiff, Alexis Lara why the report was invalid, and excused the discriminatory actions of Diana Rivas.

78.     Plaintiff, Alexis Lara proceeded to inform Defendant, Kevin Moyer that he specifically heard Diana Rivas say that she did not want HTSS to hire black and Puerto Rican people and that she was tired these protected classes being hired.

79.     Plaintiff explained that everyone within earshot heard the discriminatory comments.

80.     Then Plaintiff, explained that after the initial comment, Diana Rivas admitted to Plaintiff, Alexis Lara that she was a racist and therefore the comments were based on racial animus.

81.     Plaintiff Alexis Lara then pointed out that it did not matter if Diana Rivas was joking.

82.     Plaintiff, Alexis Lara informed Defendant, Kevin Moyer that Defendants maintained a so-called zero-tolerance policy toward discrimination and harassment in the workplace.

83.     Then Plaintiff reminded Defendant Kevin Moyer that the previous day a yellow-hat employee was escorted from the property for a much less offensive remark.

84.     Defendant Kevin Moyer then explained to Plaintiff, Alexis Lara that: "she (Diane Rivas) has the right to be racist."

85.     In fact, Defendant Kevin Moyer repeated this sentiment multiple times throughout the conversation, that Diana Rivas has a right to express racist views at work.

86.     Plaintiff, Alexis Lara was shocked, scared and horrified by Diana Riva's comments and even more-so by Defendant Kevin Moyer's refusal to allow Plaintiff, Alexis Lara to report the comment.

87.     Defendant, Kevin Moyer ordered Plaintiff, Alexis Lara to return to work.

88.     No meaningful action was taken pursuant to Plaintiff's reports of discrimination and harassment in the workplace. In fact, no action was taken at all. There was no investigation. There was no corrective action.

89.     Defendants policy of refusing to investigate discrimination from white hats aimed at yellow hats indicates Defendants' condoned, permitted, sanctioned and allowed white hats to subject yellow hats to discrimination and harassment in the workplace.

90.     Plaintiff and Defendant, Kevin Moyer were standing in a crowded area and Plaintiff felt that several employees were hanging around and listening to Plaintiff's attempt to report the discrimination and harassment with Defendant, Kevin Moyer.

91.     Accordingly, Plaintiff asked Defendant, Kevin Moyer if they could go someplace private to talk about the report of discrimination and harassment in the workplace.

92.     Defendant, Kevin Moyer said, "no we can't go anywhere private. We can talk right here."   Accordingly Defendant, Kevin Moyer refused to provide Plaintiff, Alexis Lara with a safe environment where Plaintiff could make a report of discrimination and harassment in the workplace.

93.     About an hour later, Defendant, Edwin and employee Jose Torres approached Plaintiff, Alexis Lara and informed Plaintiff that the white hats at the table where Diana Rivas made the discriminatory comment had asked both of them: "what was that yellow-hat's name who reported us?"

94.     Plaintiff was upset, scared and confused. Plaintiff was under the impression that there was a zero-tolerance policy for discrimination and harassment in the workplace.

95.     Accordingly, Plaintiff, Alexis Lara visited the office of Defendant Quincy Troupe later the same day to make a report of discrimination and harassment in the workplace, and specifically report Diana Rivas's race-based comments and Defendant, Kevin Moyer's refusal to conduct a meaningful investigation or allow the report to be made.

96.     Defendant, Quincy Troupe is the CEO for Samuel Adams.

97.     While Plaintiff, Alexis Lara was waiting in Defendant Quincy Troop's office, Plaintiff was redirected to Defendant Derrick, who is Defendant Kevin Moyer's direct supervisor.

98.     Plaintiff, Alexis Lara reported Diana Rivas's and Defendant Kevin Moyer's discriminatory conduct from earlier that day.

99.     Defendant Derrick informed Plaintiff, Alexis Lara that he would talk to Defendant Kevin Moyer and respond to Mr. Lara's report of discrimination before 2:00 P.M. that day.

100.    Defendant Derrick never responded to Plaintiff, Alexis Lara's report of discrimination in the workplace.

101.    Defendant, Derrick saw Plaintiff later the same day and refused to acknowledge Plaintiff even though it was after 2:00 P.M., when Derrick promised to respond to Plaintiff's report of discrimination.

102.    Plaintiff, Alexis Lara reported discrimination and harassment in the workplace and Defendant, Derrick refused to take prompt remedial action. No investigation was performed. No corrective action was taken at all.

103.    Just a few moments after Plaintiff punched out for the day, Plaintiff received a text message informing Plaintiff that he would not work the next day, Friday November 30, 2018.

104.    Mr. Lara then received a notice that his overtime hours were cancelled on Saturday.

105.    When Plaintiff returned to work on Monday December 3, 2018, Plaintiff learned that no other employee who he worked with had their overtime cancelled that weekend.

106.    Plaintiff discovered that no investigation or discipline had resulted pursuant to Plaintiff's multiple reports of discrimination and harassment in the workplace.

107.    Plaintiff, Alexis Lara was also met with open hostility from the white-hat employees including Defendant, Kevin Moyer the following Monday.

14

108.   Plaintiff, Alexis Lara next attempted to report the discrimination and harassment to Defendant Bill, who worked in the corporate section in the office-section of the same facility where Plaintiff worked in the warehouse.

109.   Plaintiff provided Defendant Bill with a detailed account of everything that had transpired up until that point, beginning with Diana Rivas's discriminatory comments and claim that she was racist, to Kevin Moyer's refusal to allow Plaintiff to report the discrimination, to Defendant, Derrick's promise and failure to respond by 2:00 P.M. the same day, to the text messages immediately thereafter informing Plaintiff that he was not permitted to return to work the following day and eliminating Plaintiff's overtime.

110.   Defendant Bill appeared shocked and sympathetic and promised to take prompt corrective action.

111.   At the end of the conversation, Plaintiff discovered that Defendant Kevin Moyer had been standing outside the room the entire time when Plaintiff reported the discrimination and harassment to Defendant Bill.

112.   When Plaintiff, Alexis Lara left Bill's office, Defendant Kevin Moyer stood in front of Plaintiff and said: "everything OK here?"   Defendant, Kevin Moyer's conduct and demeanor was violent and threatening.   Plaintiff did not know how Defendant, Kevin Moyer knew that Plaintiff was discussing the unlawful conduct with Defendant, Bill, however, Plaintiff no longer felt safe as Defendants had taken actions against Plaintiff interfering with Plaintiff's work environment.

113.   Plaintiff, Alexis Lara was scared and shocked at seeing Defendant, Kevin Moyer directly outside the office while Plaintiff was reporting Defendant Kevin Moyer's unlawful conduct.

114.     Plaintiff, Alexis Lara attempted to return to his work.

115.     As Plaintiff was walking to the warehouse floor, Defendant Kevin Moyer approached Plaintiff again.

116.     Defendant Kevin Moyer confronted Plaintiff and said: "what were you doing up there (referring to talking with Defendant, Bill in his office).

117.     Defendant, Kevin Moyer then said, "you are jumping the gun."

118.     Plaintiff, Alexis Lara said to Defendant Kevin Moyer, "I do not feel that you handled the situation correctly."

119.     Defendant Kevin Moyer said, "Well you were not there and it is our word versus your word."   Defendant, Kevin Moyer's comment that it was "our word" indicated the concerted effort to deny Plaintiff the ability to safely report discrimination and harassment in the workplace.

120.     Plaintiff felt threatened and was confused that a supervisor would suggest lying about the reports of discrimination and harassment in the workplace.

121.     Plaintiff, Alexis Lara was scared and walked away.

122.     Defendant Bill refused to take any corrective action in response to Plaintiff's reports of discrimination and harassment in the workplace. There was no investigation.   There was no ameliorative response.

123.     On or around Wednesday December 5, 2018, Plaintiff, Alexis Lara contacted Defendant Samuel Adams' discrimination and harassment hotline to report the events of the last week; specifically the discriminatory and race-based comments that caused Plaintiff to make a report, and   Defendant, Kevin Moyer, Defendant, Derrick and Defendant, Bill's refusal to investigate and initiate corrective action, and Defendants decision to alter the conditions of

Plaintiff's employment by eliminating overtime and informing Plaintiff that he could not work the day following the initial report.

124.    On Friday December 7, 2018, Defendant Alison, a representative from Defendant Samuel Adams' Human Resources Department spoke to Plaintiff, Alexis Lara about the events of the past week.

125.    Plaintiff, Alexis Lara explained to Defendant Alison he was attempting to adhere to Defendants' so-called zero tolerance policy for discrimination and harassment in the workplace.

126.    Plaintiff provided a detailed account regarding what has transpired and outlined Defendants' total failure to treat yellow hats in the same regard as white hats.

127.    Plaintiff explained that this discriminatory policy can cause employees to feel uncomfortable reporting discrimination and harassment in the workplace.

128.    Plaintiff explained to Defendant Alison that Plaintiff was extremely disappointed at the apparent double-policy Defendants maintained for yellow hats and white hats.

129.    Defendant Alison from HR promised to keep Defendant Kevin Moyer away from Mr. Lara and investigate the issue. This is not what occurred.   Less than one week later, Plaintiff was unlawfully terminated from his employment.

130.    On or around Tuesday December 11, 2018, Plaintiff Alexis Lara received a voicemail from Defendant Alison saying that she was still working on the investigation and would get back to Plaintiff as soon as possible.

131.    By Thursday December 13, 2018, Plaintiff Alexis Lara did not receive a single response to any of the numerous reports of discrimination and harassment in the workplace

Plaintiff had made to Defendant, Kevin Moyer, Defendant Derrick, Defendant, Bill or Defendant, Alison.

132.    Sometime around December 13, 2019, a white hat employee suggested that Plaintiff, Alexis Lara try speaking with Defendant Lewis Mars.

133.    Plaintiff, Alexis Lara spoke with Defendant Lewis Mars that day and reiterated the what had occurred over the past two weeks, from the original race-based, discriminatory remark, to Defendants total disregard for the so-called zero-tolerance policy for discrimination and harassment in the workplace.

134.    Defendant Lewis Mars was sincere and apologized on behalf of Samuel Adams to Plaintiff, Alexis Lara. Defendant, Lewis Mars claimed to take "events like this seriously."

135.    Just two hours after reporting the ongoing discrimination and harassment and retaliation to Defendant Lewis Mars, Plaintiff Alexis Lara was terminated from his employment.

136.    Defendants' stated reason for Plaintiff's termination was that Plaintiff had violated a safety policy by "wearing ear buds."

137.    At no time did Plaintiff wear earbuds during his employment for Defendants.

138.    Defendants unlawfully terminated Plaintiff, Alexis Lara due to his race, national origin, and in retaliation for Plaintiff's ongoing reports of discrimination and harassment in the workplace.

139.    As a result of Defendant's conduct, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

140.    Plaintiff was caused to sustain physical personal injuries and physical manifestations stemming from Plaintiff's emotional distress and psychological injuries.

141.    Plaintiff was caused personal physical injury as a result of Defendants' discrimination, harassment and retaliation.

142.    As a result of Defendants actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

143.    As a result of the acts and conduct complained of herein, Plaintiff suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails.

144.    Plaintiff also suffers from future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

145.    Plaintiff has further experienced severe emotional physical distress.

146.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

147.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

148.    Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

149.    At all times material Defendants failed to take appropriate remedial action in response to Plaintiff's complaints of discrimination, harassment and hostile work environment.

150.    Defendants discriminatory conduct was severe and pervasive, and created a hostile work environment for Plaintiff.

151.   The above are just some examples, of some of the discrimination, harassment and retaliation to which Defendants subjected Plaintiff due to Plaintiff's race, color and gender.

152.   Plaintiff claims a pattern and practice of discrimination, claims continuing violations, and makes all claims herein under the continuing violations doctrine.

153.   Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

### FIRST CAUSE OF ACTION
### UNDER FEDERAL LAW
### S.C. SECTION 1981
### (against all named Defendants)

154.   Plaintiff, Alexis Lara, hereby incorporates all allegations contained in paragraphs one (1) through one-hundred-fifty-three (153) as fully as if they were set forth at length.

155.   42 USC Section 1981 states in relevant part as follows:

(a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

156.   Plaintiff, as a member of the Black and/or African-American race, was discriminated against by Defendants because of his race as provided under 42 USC Section 1981 and has suffered damages as set forth herein.

157.   Plaintiff also claims unlawful retaliation under 42 U.S.C. 1981 for his opposition to Defendants' unlawful employment practices.

158.   Plaintiff makes all claims subject to Section 1981 including a claim for hostile work

environment, disparate treatment and retaliation.

**SECOND CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII –**
**DISPARATE TREATMENT AND HOSTILE WORK ENVIRONMENT**
**(all corporate Defendants only)**

159.    Plaintiff, Alexis Lara , hereby incorporates all allegations contained in paragraphs

one (1) through one-hundred-fifty-eight (158) as fully as if they were set forth at length.

160.    This claim is authorized and instituted pursuant to the provisions of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, as amended, for relief based upon the

unlawful employment practices of the above-named Defendants. Plaintiff complains of

Defendants' violation of Title VII's prohibition against discrimination in employment based, in

whole or in part, upon an employee's race, color and national origin.

161.    SEC. 2000e-2 *[Section 703]* states as follows:

(a)  Employer practices

It shall be an unlawful employment practice for an employer –

(1)  to fail or refuse to hire or to discharge an individual, or otherwise to

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin; or

(2)  to limit, segregate, or classify his employees or applicants for employment in

any way which would deprive or tend to deprive any individual of

employment opportunities or otherwise adversely affect his status as an

employee, because of such individual's race, color, religion, sex, or national

origin.

162.    Defendants engages in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et. seq.*, by discriminating against Plaintiff because of his race, color and national origin

163.    Plaintiff, Alexis Lara, was subjected to race and national origin discrimination which was severe and pervasive.

164.    Plaintiff claims that she was subjected to a hostile work environment based upon the severe and pervasive discrimination and harassment in the workplace. Defendants subjected Plaintiff to unwelcome comments and conduct that had the purpose and effect of unreasonably interfering with Plaintiff's work environment.

165.    Plaintiff was also terminated and/or denied employment based upon Plaintiff's race and national origin.   The stated reason for Plaintiff's termination is pretext as Plaintiff was terminated due to race and national origin.

166.    Defendants engaged in several acts of discrimination and harassment that were so severe that a single act was sufficient to create a hostile work environment.

167.    Defendants engaged in conduct that is willful and outrageous and conducted with full knowledge of the law.

### THIRD CAUSE OF ACTION
### RETALIATION UNDER TITLE VII
### (against corporate Defendants only)

168.    Plaintiff, Alexis Lara, hereby incorporates all allegations contained in paragraphs one (1) through one-hundred-sixty-seven (167) as fully as if they were set forth at length.

169.    Title VII of the Civil Rights Act of 1962, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful

employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter."

170.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et. seq.* by retaliating against Plaintiff with respect to the terms, conditions, and/or privileges of his employment because of his opposition to and reporting of the unlawful employment practices of Defendants.

171.    Plaintiff continued to oppose the severe and pervasive discrimination and harassment in the workplace and even submitted a written statement to report the discrimination and harassment in the workplace.

172.    Defendants refused to investigate Plaintiff's reports of discrimination and harassment in the workplace.

173.    Defendants refused to initiate prompt corrective actions.

174.    Accordingly, Defendants permitted, sanctioned, condoned, and allowed the discrimination and harassment to continue.

175.    Any corrective action taken by Defendants was not enforced and Plaintiff was subjected to a campaign of severe and pervasive retaliation which also created a hostile work environment.

176.    Plaintiff was terminated as a direct result of reporting discrimination and harassment in the workplace.   If Plaintiff would never have made such reports, he would still be employed by Defendants today.

## JURY DEMAND

Plaintiff requests a jury trial on all issued to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally,

in an amount to be determined at the time of trial plus interest, punitive damages, liquidated

damages, statutory damaged, attorney's fees, costs, and disbursement of action; and for such

other relief as the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

By: _____

Seth D. Carson, Esquire
1835 Market Street, Suite 2950
Philadelphia, Pennsylvania 19103
Phone: 215.391.4790
Email: seth@dereksmithlaw.com

DATED: January 29, 2020