UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ALEXIS LARA,                                          :
                              Plaintiff,              :
                                                      :
              v.                                      :                 No. 5:20-cv-0498
                                                      :
SAMUEL ADAMS PENNSYLVANIA                             :
BREWING COMPANY, LLC, individually                    :
and d/b/a SAMUEL ADAMS, SAMUEL                        :
ADAMS BREWERY COMPANY, LTD,                           :
SAMUEL ADAMS PENNSYLVANIA                             :
BREWING COMPANY, SAMUEL                               :
ADAMS, HTTS, INC., KEVIN MOYER,                       :
individually, EDWIN (last name unknown),              :
individually, QUINCY TROUPE,                          :
individually, DERRICK (last name                      :
unknown), individually, BILL (last name               :
unknown), individually, ALISON GLEN,                  :
individually, and LEWIS MARS,                         :
individually,                                         :
                              Defendants.             :

_____

## **O P I N I O N**

**Defendants' Motion to Dismiss Plaintiff's Amended Complaint for
Failure to State a Claim, ECF No. 9—GRANTED, in part, and DENIED, in part**

**Joseph F. Leeson, Jr.**                                         **September 1, 2020**
**United States District Judge**

## I.      INTRODUCTION

        Alexis Lara is a Hispanic man who worked in a temporary position at the Samuel Adams

brewery in Breinigsville, Pennsylvania, from March 2018 until his termination on December 13,

2018.  Lara now sues American Craft Brewery, LLC ("Sam Adams"),[1] the staffing agency that

_____

[1]      Defendants state that Lara has improperly named "Samuel Adams Pennsylvania Brewery
Company, LLC; Samuel Adams Brewery Company, Ltd.; Samuel Adams Pennsylvania Brewery
Company; and Samuel Adams as Defendants," and that the proper corporate Defendant in this

placed him in his position at the brewery ("HTTS"), and seven individual Sam Adams

employees (collectively, "Defendants"), for alleged race-based discrimination, retaliation, and

hostile work environment during his tenure there.  Presently before the Court is Defendants'

motion to dismiss Lara's Amended Complaint in its entirety for failure to state a claim.  For the

reasons set forth below, Defendants' motion is granted, in part, and denied, in part.

## II.    BACKGROUND

### A.    Facts alleged in the Amended Complaint[2]

In March 2018, staffing agency HTSS, Inc. placed Lara, a Hispanic man,[3] in a temporary

warehouse packager position at the Sam Adams brewery in Breinigsville, Pennsylvania.[4]  *See*

Lara's Amended Complaint ("Am. Compl.") [ECF No. 7] ¶¶ 2, 30, 47-48.  The events that give

rise to the instant action began at the daily staff meeting on the morning of November 29, 2018.

Lara alleges that during that meeting, he overheard a white female employee comment to three

white male employees, "I am tired of HTSS hiring all these blacks and Puerto Ricans."  *Id.* ¶¶

---

action is "American Craft Brewery, LLC."  Defendants' Memorandum in Support of their
Motion to Dismiss ("Defs.' Mem.") [ECF No. 9] at 1 n.1.

[2]       These facts are taken from the Amended Complaint and accepted as true, with all
reasonable inferences drawn in Lara's favor.  *See Lundy v. Monroe Cty. Dist. Attorney's Office*,
No. 3:17-CV-2255, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017), *report and
recommendation adopted*, 2018 WL 2219033 (M.D. Pa. May 15, 2018).  Except where necessary
for context, the Court's recitation of the allegations of the Amended Complaint does not include
conclusory assertions or legal contentions, neither of which need be considered by the Court in
determining the viability of Lara's claims.  *See Brown v. Kaiser Found. Health Plan of Mid-Atl.
States, Inc.*, No. 1:19-CV-1190, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019).

[3]       Lara refers to himself as "a member of the Black and/or African-American race" in the
portion of the Amended Complaint addressing his claims under 42 U.S.C. § 1981.  Am. Compl.
¶ 221.  In the rest of the Amended Complaint he states that he is Hispanic.

[4]       Lara avers that he "was hired by and received a paycheck from HTSS, Inc., however, the
day to day assignments and job responsibilities [he] carried out were controlled by Samuel
Adams."  Am. Compl. ¶ 31.  The issue of which entity is properly considered Lara's "employer"
for purposes of his claims—Sam Adams, HTTS, or both—is addressed in further detail below.

76-77, 80.  In response, one of the male employees asked the woman, "[a]re you a racist?" to which the woman responded, "[y]es."  *Id.* ¶ 81.

Lara states that the woman made both comments loudly and in his direction, and as a result claims he was the intended recipient of the woman's remarks.  Am. Compl. ¶¶ 78-79, 82. At some point after overhearing the remarks, Lara asked the female employee directly, "[d]id you just say you are racist?" to which she responded, "[y]es."  *Id.* ¶¶ 84-85.  Lara then raised his hand to report the remarks to his supervisor, Kevin Moyer.  *Id.* ¶¶ 86-87.

When the daily meeting was over, both the employee who made the comment and Lara approached Moyer to talk about the incident.  Am. Compl. ¶¶ 103-06.  According to Lara, after Moyer finished speaking with the employee who made the comments, he turned to "yell" at Lara for interrupting the meeting and claiming that Lara could not have been able to hear the purported comment as he was not sitting at the same table as the white employees.  *Id.* ¶¶ 107-13.  Lara claims Moyer moreover dismissed the comment as a possible joke, stating that the employee who made the comment "could have been joking. I already spoke to her."  *Id.* ¶ 118. Moyer also stated that the female employee "has the right to be racist," and Lara claims that Moyer "repeated this sentiment multiple times throughout the conversation," specifically, "that 'she has the right to express racist views at work.'"  *Id.* ¶¶ 128-29.  Lara states that throughout their interaction, Moyer was "aggressive, hostile, and agitated" by Lara's attempt to report the discriminatory comment.  *Id.* ¶¶ 130-32.  Moyer also allegedly rebuffed Lara's request to talk to him privately about the incident, forcing Lara to make the report in front of the employee he was reporting.  *See id.* ¶¶ 137-43.

Lara claims that about an hour after the meeting, "Defendant, Edwin and employee Jose Torres approached [Lara] and informed [him] that the white, Caucasian employees who were

sitting at the table" where the comment was made "had asked both of them" for Lara's identity. Am. Compl. ¶ 145.  According to Lara, "[a]fter making the report of discrimination and harassment in the workplace, the hostile work environment was ratcheted up."  *Id*. ¶ 146.

The Amended Complaint avers that the remarks Lara overheard occurred within what was an overall discriminatory climate at Sam Adams.  *See* Am. Compl. ¶ 75.  In particular, Lara singles out for condemnation Sam Adams' "yellow hat" and "white hat" system for distinguishing temporary employees from permanent employees.  *Id*. ¶¶ 59-68.  Lara avers that under this system, the temporary employees, who were almost all Hispanic, were forced to wear yellow hard hats; the permanent employees, who were primarily white, were referred to as "white hats."  *Id*.  According to Lara, Defendants frequently referred to the Hispanic employees as "yellow," which Lara intimates was a derogatory method of identification.  *Id*. ¶ 63.  Lara states that this system resulted in de facto segregation, separating the Hispanic and white employees in work assignments and meetings and favoring "white hats" for preferential treatment.  *See id.* ¶¶ 68-70.  Lara claims that, for example, "white hat" Caucasian employees sat in the front of meetings, and "yellow hat" Hispanic employees sat in the back, occasionally giving up seats to "white hats" if there were not enough chairs in the room.  *Id.* ¶¶ 70-71. Further, Lara avers that Defendants sometimes threw away food and bags that belonged to "yellow hat" employees, but not "white hat" employees.  *Id.* ¶¶ 72-73.

According to Lara, despite the segregated atmosphere, Sam Adams had a zero-tolerance policy for discrimination and harassment in the workplace.  Am. Compl. ¶ 90.  In accordance with this policy, the day prior to the November 29 meeting at which Lara overheard the racist comment regarding temporary employees, "a yellow hat employee who was not white, or Caucasian was escorted from the property and terminated for allegedly making a race-based

remark." *Id*. ¶ 88.  Lara points to the treatment of this "yellow hat" employee vis-à-vis the hands-off approach taken with the white employee the following day as evidence of the unequal enforcement of the zero-tolerance policy.  *See id*. ¶ 92.  He claims the failure of Defendants to take action against racist behavior when perpetrated by white employees "condoned, sanctioned, encouraged, and permitted the white, Caucasian employees to continue the severe and pervasive discrimination and harassment in the workplace." *Id.* ¶ 100.

Unsatisfied with Moyer's response to his report of discriminatory behavior on November 29 and with what he perceived to be inconsistencies in the enforcement of the anti-discrimination policy generally, Lara again attempted to report the incident of November 29—this time to Quincy Troupe.  Am. Compl. ¶ 148.  Troupe was "the CEO for Samuel Adams." *Id.* ¶ 149. Troupe's office redirected Lara to Defendant Derrick, Moyer's direct supervisor.  *See id.* ¶¶ 150-52.  Derrick told Lara he would talk to Moyer and promised to respond to Lara's report by 2:00 p.m. the same day.  *See id.* ¶¶ 153, 155.  Lara avers that even though Derrick was in a position to "conduct a meaningful investigation and initiate prompt corrective measures," he ignored Lara at 2:00 p.m. and ultimately failed to respond or take corrective action.  *Id.* ¶¶ 156-57.  Lara claims that, in fact, the opposite occurred:  Just a few moments after punching out for the day, Lara received a text message informing him he would not be working the following day, Friday, November 30, 2018. *Id*. ¶ 158.  Lara also learned that his overtime hours for the subsequent Saturday were being canceled.  *Id*. ¶ 160.  According to the Amended Complaint, no one else Lara worked with had their overtime cancelled; rather, this measure, along with having his Friday hours cancelled, was part of "Defendants' campaign of retaliation" against Lara.  *Id*. ¶¶ 159-61.

The following Monday, December 3, 2018, Lara attempted to report the perceived discriminatory conduct he experienced to Defendant Bill, who worked in the corporate section of the brewery.[5]  *See* Am. Compl. ¶ 165.  As to this report, Lara explains as follows:

> Plaintiff provided Defendant Bill with a detailed account of everything that had transpired up until that point, beginning with [the female employee's] discriminatory comments and claim that she was racist, to Kevin Moyer's refusal to allow Plaintiff to report the discrimination, to Defendant, Derrick's promise and failure to respond by 2:00 P.M. the same day, to the text messages immediately thereafter eliminating Plaintiff [sic] hours and benefits, and Defendant, Kevin Moyer's aggressive conduct, and the employees targeting Plaintiff after Plaintiff made the reports.

*Id.* ¶ 166.  According to Lara, although Bill promised to take action and appeared "shocked and sympathetic" at Lara's report, *id*. ¶ 167, he ultimately "refused to take corrective action in response to [Lara's] reports of discrimination and harassment in the workplace. There was no investigation and no ameliorative response," *id*. ¶ 184.

The Amended Complaint goes on to aver that as Lara was leaving Bill's office, he discovered that Moyer had been standing outside of the room the entire time that Lara was talking with Bill.  Am. Compl. ¶ 168.  Moyer then asked Lara, "everything OK here?" and, "what were you doing up there?"  *Id.* ¶¶ 170, 176-77.  According to the Amended Complaint, Moyer proceeded to tell Lara that he was "jumping the gun," to which Lara replied, "I do not feel that you handled the situation correctly."  *Id.* ¶¶ 178-79.  In response, Moyer stated, "[w]ell you were not there and it is our word versus your word," which Lara alleges "indicated the concerted effort to deny [Lara] the ability to safely report discrimination and harassment in the workplace."  *Id.* ¶¶ 180-81.

---

[5]   It is not clear from the Amended Complaint exactly what position "Defendant Bill" held at Sam Adams.

On Wednesday, December 5, 2018, Lara contacted Sam Adams' antidiscrimination and harassment hotline to report the events of the previous week.  Am. Compl. ¶ 185.  In response, on December 7, 2018, Alison Glen, a representative of Sam Adams' Human Resources Department, contacted Lara.  *Id*. ¶ 187.  After explaining what he perceived to be the discriminatory treatment of Hispanic employees generally, as well as the discrete instances of perceived discrimination and harassment he suffered, Lara claims that Alison "promised to keep Defendant Kevin Moyer away from [Lara] and investigate the issue," however, "[t]his is not what occurred."  *Id*. ¶¶ 188-93.  According to Lara, on Tuesday, December 11, 2018, he "received a received a voicemail from Defendant Alison saying that she was still working on the investigation and would get back to [him] as soon as possible," yet "[b]y Thursday December 13, 2018, [Lara] did not receive a single response to any of the numerous reports of discrimination and harassment in the workplace" that he had made.  *Id*. ¶¶ 195-96.

Following the recommendation of a "white hat" employee, on the same day—December 13—Lara made one final report, this time to Defendant Lewis Mars.[6]  Am. Compl. ¶¶ 197-98.  According to the Amended Complaint, Mars "acted sincere and apologized on behalf of Samuel Adams," and "claimed to take 'events like this seriously.'"  *Id.* ¶¶ 199-200.  However, Lara claims that just two hours after this report, he was terminated for purportedly violating a safety policy by "wearing ear buds."[7]  *Id*. ¶¶ 201-02.  He avers that "[a]t no time did [he] wear ear buds during his employment for Defendants," and rather, claims he was fired "due to his race, national

---

[6]     Although it is not clear from the Amended Complaint exactly what position Mars held at Sam Adams, Lara claims (in conclusory fashion) that "Mars was directly involved in the decision to unlawfully terminate Plaintiff's employment as part of Defendants' campaign of retaliation."  Am. Compl. ¶ 28.

[7]     "Ear buds" are wireless headphones.

origin, and in retaliation for Plaintiff's ongoing reports of discrimination and harassment in the workplace." *Id*. ¶ 204.

Based upon the above factual allegations, Lara purports to assert the following causes of action:[8] (1) employment discrimination, retaliation, and hostile work environment based on race in violation of 42 U.S.C. § 1981, *see* Am. Compl. ¶¶ 219-30; (2) discrimination and hostile work environment based on race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *see id*. ¶¶ 231-39; (3) retaliation in violation of Title VII, *see id*. ¶¶ 240-48; (4) discrimination based on race,[9] in violation of the Pennsylvania Human Relations Act ("PHRA"), *see id*. ¶¶ 249-52; (5) retaliation in violation of the PHRA, *see id.* ¶¶ 253-55; and (6) aiding and abetting discrimination based on race, in violation of the PHRA, *see id*. ¶¶ 256-58.

### B.     Procedural background

Lara filed the initial Complaint in this action on January 29, 2020.  *See* ECF No. 1.  On May 4, 2020, Defendants jointly moved to dismiss the Complaint.  *See* ECF No. 6.  In response to this motion, Lara filed his Amended Complaint on May 18, 2020, which remains the operative pleading.  *See* ECF No. 7.  Defendants filed their motion to dismiss the Amended Complaint on June 1, 2020.  *See* ECF No. 9.  Lara filed opposition to the motion on June 15, 2020, *see* ECF

---

[8]     By listing the causes of action as they appear in the Amended Complaint, the Court does not endorse them as viable or properly pleaded; they are simply reproduced for clarity.

[9]     Lara states that this claim is also based upon alleged discrimination due to his "color and gender," as well as discrimination "against [Lara] due to [his] disability and request for reasonable accommodations." Am. Compl. ¶ 251.  There are no allegations in the Amended Complaint to support claims of discrimination based on Lara's "color," "gender," or "disability." Similarly, although Lara claims discrimination based upon his "national origin" at several points in the Amended Complaint, *see, e.g*., Am. Compl. ¶¶ 232-37, there are insufficient allegations to sustain a claim of discrimination based upon national origin.  Indeed, Lara does not allege any facts with respect to his national origin.  For these reasons, the Court construes Lara's claims to be alleging discrimination based on his race alone, and limits its analysis to this construction.

No. 10, and Defendants filed a reply memorandum in further support of their motion on June 22, 2020, *see* ECF No. 11.

## III.    LEGAL STANDARD

### A.    Motions to dismiss under Rule 12 (b)(6) for failure to state a claim

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the appropriate pleading standard in federal civil actions and set forth a two-step approach to be used when deciding motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

First, district courts are to "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see Thourot v. Monroe Career & Tech. Inst.*, No. CV 3:14-1779, 2016 WL 6082238, at *2 (M.D. Pa. Oct. 17, 2016) (explaining that "[a] formulaic recitation of the elements of a cause of action" alone will not survive a motion to dismiss). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A claim plausibly gives rise to an entitlement to relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This standard, commonly referred as the "plausibility standard," "is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556-57). It is only where the "[f]actual allegations . . . raise a right to relief above the speculative level" that the plaintiff has stated a plausible claim.[10] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Putting these steps together, the Court's task in deciding a motion to dismiss for failure to state a claim is to determine whether based upon the facts as alleged, which are taken as true, and disregarding legal contentions and conclusory assertions, the complaint states a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 679; *Ashford v. Francisco*, No. 1:19-CV-1365, 2019 WL 4318818, at *2 (M.D. Pa. Sept. 12, 2019) ("To avoid dismissal under Rule 12(b)(6), a civil complaint must set out sufficient factual matter to show that its claims are facially plausible.").

Additionally, in adjudicating a Rule 12(b)(6) motion, the scope of what may be considered is necessarily constrained: A court may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[11] *United States v. Gertsman*, No. 15-8215, 2016 WL 4154916, at *3 (D.N.J. Aug. 4, 2016) (quoting *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013)).

---

[10] As the Supreme Court counseled, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679

[11] A court adjudicating a Rule 12(b)(6) motion may also take judicial notice of certain undisputed facts. *See Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, No. CV 15-3435, 2017 WL 5668053, at *9 (E.D. Pa. Nov. 27, 2017).

**B.     Pleading standards for employment discrimination and retaliation claims: the prima facie elements need not be pleaded**

At the outset, it is important to note that with respect to certain employment discrimination claims,[12] a plaintiff need not plead the prima facie elements to survive a motion to dismiss. *See Dreibelbis v. Cty. of Berks*, 438 F. Supp. 3d 304, 313 (E.D. Pa. 2020) (explaining that "the plaintiff '[is] not required to plead a prima facie case in order to survive a motion to dismiss.'" (quoting *Kelly v. H.D. Supply Holdings*, Inc., No. CIV. 14-372, 2014 WL 5512251, at *3 (D.N.J. 2014))); *see Swierkiewicz v. Sorema N. A*., 534 U.S. 506, 511 (2002) (explaining that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case" of employment discrimination).  Rather, these claims require "facial plausibility," meaning that the allegations must state "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claim's] necessary element[s]." *Dreibelbis*, 438 F. Supp. 3d at 313-14 (quoting *Connelly v. Lane Const. Corp*., 809 F.3d 780, 789 (3d Cir. 2016)).

The reason for reviewing employment discrimination and retaliation claims in this manner at the pleading stage is as follows.  At the burden of proof stage, these claims are generally subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework,

> the plaintiff must first establish a *prima facie* case of discrimination . . . . If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action against the employee. The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a "pretext for discrimination, and not the real motivation for the unfavorable job action."

---

[12]     As explained below, this pleading standard does not appear to apply to claims of hostile work environment.

*Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 652 (E.D. Pa. 2018) (quoting

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).  However, "the *McDonnell*

*Douglas* framework does not apply in every employment discrimination case. For instance, if a

plaintiff is able to produce *direct* evidence of discrimination, he may prevail without proving all

the elements of a prima facie case."[13]  *Swierkiewicz*, 534 U.S. at 511 (emphasis added).  For this

reason, the Supreme Court in *Swierkiewicz v. Sorema* recognized that it would be "incongruous

to require a plaintiff, in order to survive a motion to dismiss, to plead more facts"—*i.e.*, facts

satisfying the prima facie elements of his claim—"than he may ultimately need to prove to

succeed on the merits if direct evidence of discrimination is discovered."  *Id*. at 506; *see Kelly*,

2014 WL 5512251, at *4 ("Plaintiff need not plead all the elements of a prima facie case of

discrimination because those elements may not be required at trial. Instead, plaintiff's claim must

be facially plausible and give fair notice to the defendants of the basis of the claim.").

　　　　Importantly, this deferential pleading standard for employment discrimination and

retaliation claims[14] has survived the transition of the general pleading standard from a "no set of

---

[13]　　　Significantly, at the motion to dismiss stage, the Court does not engage in fact finding or
with issues of evidence, proof, or burdens of proof; rather, the Court accepts all well-pleaded
factual allegations as true.  Therefore, the framework set forth in *McDonnell Douglas* and its
shifting burdens of proof are inapplicable to the instant analysis.  *See, e.g., Bartlett v. Kutztown
Univ.,* No. 13–4331, 2015 WL 766000, at *8 n.11 (E.D. Pa. Feb. 23, 2015) (noting that a plaintiff
responding to a Rule 12(b)(6) motion "need not establish by a preponderance of evidence that
Defendants' purported reason for terminating Plaintiffs' employment . . . was a pretext for
discriminatory conduct" because "the *McDonnell Douglas* burden-shifting standard does not
apply" at the motion to dismiss stage).

[14]　　　Retaliation is a species of discrimination.  *Darrington v. Milton Hershey Sch.*, 958 F.3d
188, 196 (3d Cir. 2020) ("Retaliation is . . . a form of 'discrimination' because the complainant is
subjected to differential treatment." (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167,
173-74 (2005))); *see Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) ("If an
employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the
employer to advance a legitimate, non-retaliatory reason for its adverse employment action.").
Accordingly, plaintiffs asserting claims of retaliation need not allege the prima facie elements of
their claims to survive a motion to dismiss.  *See Connelly v. Lane Const. Corp.*, 809 F.3d 780,

facts" standard under *Conley v. Gibson*, 355 U.S. 41 (1957),[15] to the current "plausibility"

standard ushered in by *Bell Atl. Corp. v. Twombly* and later *Ashcroft v. Iqbal*. *See Lee v. Univ. of*

*Pennsylvania, Sch. of Dental Med.*, No. CV 19-835, 2019 WL 4060843, at *5 (E.D. Pa. Aug. 27,

2019) ("Although [*Swierkiewicz*] pre-dated *Twombly* and *Iqbal*, the Third Circuit has continued

to follow its guidance in Title VII cases thereafter.")[16]

The Court proceeds to address Lara's causes of action with this framework in mind.

## IV. ANALYSIS

As a general matter, "[c]laims of race-based employment discrimination under Section

1981, Title VII, and the PHRA are analyzed coextensively."[17]  *McKinney v. Supreme Mid-Atl.*

---

789 (3d Cir. 2016) (explaining that a plaintiff's "retaliation claim may survive [a] motion to dismiss if she pleads sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence" of the prima facie elements).

[15] The standard articulated in *Conley*, which preceded the current standard, held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46.

[16] District courts continue to follow the rule set forth in *Swierkiewicz*. *See, e.g.*, *Sztroin v. PennWest Indus. Truck, LLC*, No. CV 17-665, 2017 WL 4355575, at *4 (W.D. Pa. Oct. 2, 2017) (explaining that a Title VII plaintiff need not "establish a prima facie case" in order to survive a motion dismiss; rather, the plaintiff "need only set forth sufficient facts to raise a reasonable expectation that discovery will reveal evidence that [she] was a member of a protected class and that she suffered an adverse employment action"); *Watson v. Department of Services for Children, Youths and Their Families Delaware,* 2013 WL 1222853, * 4 (D. Del. Mar. 26, 2013) (reviewing the sufficiency of a Title VII race discrimination claim and concluding that "a complaint in an employment discrimination lawsuit need not contain specific facts establishing a *prima facie* case of discrimination under *McDonnell Douglas*," as well as collecting cases); *Pietek v. Don Rosen Imports,* 2013 WL 968294, *2 (E.D. Pa., March 13, 2013) (explaining, with respect to *Swierkiewicz*, that "[a]lthough th[e] decision pre-dated *Twombly* and *Iqbal,* the Third Circuit has continued to follow its guidance in Title VII cases decided thereafter").

[17] However, it is important to note that "a claim of disparate *impact*"—as opposed to disparate *treatment*—"is unavailable under § 1981." *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (emphasis added).  The Supreme Court has explained that "§ 1981 was enacted to prevent purposeful discrimination and 'did not include practices that were neutral on their face . . . but that had the incidental effect of disadvantaging blacks to a greater degree than whites.'"  *Id.* (quoting *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 388 (1982)).  Lara's

*Corp.*, No. 1:17-CV-2024, 2018 WL 6182058, at *3 (M.D. Pa. Nov. 27, 2018) (citing

*Castleberry*, 863 F.3d at 263 (addressing § 1981 and Title VII claims) and *Huston v. Procter &*

*Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (addressing Title VII and

PHRA claims)); *Williams v. Verizon New Jersey, Inc.*, No. CV 2:19-09350, 2020 WL 1227663,

at *7 (D.N.J. Mar. 12, 2020) ("The elements of a § 1981 discrimination claim likewise parallel

those of a Title VII claim."); *Hewitt v. BS Transportation of Illinois, LLC*, 355 F. Supp. 3d 227,

237 (E.D. Pa. 2019) ("The proper analysis under Title VII and the Pennsylvania Human

Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts

interchangeably." (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001))).  Because

Lara's claims for disparate treatment discrimination, retaliation, and hostile work environment

are brought under § 1981, Title VII, and the PHRA, these claims are analyzed together.[18]

The Court first addresses each claim with respect to Sam Adam:  Based upon the

allegations in the Amended Complaint and for purpose of Defendants' motion, Lara has

adequately alleged that he and Sam Adams shared an employee-employer relationship.[19]  The

---

discrimination claims appear to be limited to disparate treatment claims.  *See, e.g.*, Am. Compl. ¶ 223.

[18]     There is one exception to this observation:  Lara does not appear to assert a hostile work environment claim under the PHRA, and rather only claims of discrimination and retaliation.

[19]     Notwithstanding that Lara admits he "was hired by and received a paycheck from HTSS, Inc.," Am. Compl. ¶ 31, at this stage of the proceedings, the Court finds that Lara has met his burden of alleging that he and Sam Adams shared an employee-employer relationship for purposes of the statutory provisions under which he is suing.  *See Shah v. Bank of Am.*, 346 F. App'x 831, 834 (3d Cir. 2009) ("In order to determine whether a person is an employee for purposes of Title VII, the common law of agency and the traditional master-servant doctrine applies. To that end, the court should consider: the hiring party's right to control the manner and means by which the product is accomplished [;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee

Court subsequently addresses whether liability may properly lie against HTTS or any of the individual Defendants.

### A.    Disparate treatment discrimination:  Lara has sufficiently pleaded his claims

"To set forth a claim for disparate treatment employment discrimination," a plaintiff must plead facts that "'raise a reasonable expectation that discovery will reveal evidence' of the following *prima facie* elements:"  (1) that he is a member of a protected class; (2) that he was qualified for the position sought to be retained; (3) that he suffered an adverse employment action; and (4) that either similarly-situated non-members of the protected class were treated more favorably, or the adverse job action occurred under circumstances that could indicate that Lara's protected status played a motivating or determinative factor in the adverse action.[20]

---

benefits; and the tax treatment of the hired party." (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24 (1992))).

[20]    The statutory language of the relevant provision of 42 U.S.C. § 1981 reads as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other

42 U.S.C. § 1981(a).
The statutory language of the relevant provision of Title VII reads as follows:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*McKinney*, 2018 WL 6182058, at *3 (quoting *Connelly*, 809 F.3d at 789, 791); *see Nerviano v. Contract Analysis Sys., LLC*, No. CV 17-4907, 2018 WL 2240533, at *5 (E.D. Pa. May 16, 2018) (citing *Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142, 144-45 (3d Cir. 2007)); *see also Castleberry*, 863 F.3d at 266  (explaining that the prima facie elements of a disparate treatment claim under § 1981 require a plaintiff to show "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.").

The Court finds that Lara has pleaded sufficient facts to state claims of disparate treatment discrimination based on race in violation of § 1981, Title VII, and the PHRA.  In particular, he states that he is of Hispanic descent, and is therefore a racial minority and a member of a protected class.  *See* Am. Compl. ¶ 2.  The Amended Complaint further alleges that at all relevant times, Lara was qualified for his position and satisfied all relevant job requirements, an allegation that is further supported by the length of his tenure at Sam Adams.  *See id.* ¶ 50.  Nor can it be disputed that Lara suffered an adverse employment action in the form

---

4 2 U.S.C. § 2000e-2(a).

> The statutory language of the relevant provision of the PHRA reads as follows:
>
> It shall be an unlawful discriminatory practice . . . .
>
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

4 3 PA. CONS. STAT. § 955(a).

of his termination.[21]  *See id.* ¶¶ 201-02.  Finally, the Court finds that the Amended Complaint's allegations are sufficient to give rise to a reasonable expectation that discovery will reveal evidence that either (i) similarly-situated non-Hispanic employees of Sam Adams were treated more favorably than Lara, and/or (ii) that Lara's termination occurred under circumstances that could indicate that his race played a motivating or determinative factor in his termination.

As to this final element—more favorable treatment for non-Hispanic employees or circumstances indicating race motivated the termination—drawing all reasonable inferences in Lara's favor, the Court finds the following allegations in particular, and in combination with one another, are sufficient for Lara to meet his burden at this stage of the litigation:  (i) the comment and admission of racism by the white employee on November 29,[22] *see id.* ¶¶ 76-85; (ii) Moyer's alleged dismissal of the comment as a potential joke and his comment that the employee has the right to be racist, *see id.* ¶¶ 118-29; (iii) the termination of a non-white employee the preceding day for similar behavior, *see id.* ¶ 88; (iv) Defendants' failure to address what Lara perceived as a racially insensitive work atmosphere despite Lara's multiple complaints, *see id.* ¶ 166; and (v) the circumstances of Lara's termination—in particular, his denial of having ever worn ear buds while working for Defendants, the purported justification for his termination, *see id.* ¶¶ 201-03.

---

[21]   "Certainly . . . termination constitutes an adverse employment action for purposes of [ ] racial discrimination claims."  *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 691 (E.D. Pa. 2016).

[22]   Defendants argue that Lara's disparate treatment claim under § 1981 fails as a matter of law because the Amended Complaint's allegations "fail to provide any basis to support a contention that Sam Adams or HTSS intentionally discriminated against [Lara] on the basis of his race (Hispanic), as required by Section 1981. To the contrary, the initial statement that was allegedly made makes no reference to [Lara's] race and refers to national origin—which is not actionable pursuant to Section 1981."  Defs.' Mem. at 8.  The Court finds this argument to be without merit.  The alleged comment's reference to "blacks and Puerto Ricans," Am. Compl. ¶ 77, is, in combination with Lara's other allegations, sufficient to implicate race as opposed to solely national origin.

For these reasons, the Court finds that Lara has successfully stated claims for disparate treatment discrimination based upon race against Sam Adams in violation of § 1981, Title VII, and the PHRA.

### B.    Retaliation:  Lara has sufficiently pleaded his claims

To state a claim of retaliation under § 1981, Title VII, and the PHRA, a plaintiff must plead facts that raise a reasonable expectation that discovery will lead to evidence capable of satisfying the following elements:  that "(1) she engaged in activity protected by [the relevant statute]; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." [23]  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995)), *as amended* (Sept. 13, 2006).  "With respect to

---

[23]    The anti-retaliation provision of Title VII, which is distinct from the general discrimination provision, provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).
    The anti-retaliation provision of the PHRA is also distinct from the general discrimination provision, and provides as follows:

> It shall be an unlawful discriminatory practice . . . .
>
> (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 Pa. Cons. Stat. § 955(d).

'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  *Moore*, 461 F.3d at 341 (quoting *Slagle v. County of Clarion,* 435 F.3d 262, 266 (3d Cir. 2006)); *see Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) ("[O]pposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context.").  Moreover, "[i]n retaliation claims under § 1981, a plaintiff must establish an underlying § 1981 violation."[24] *Brennan v. City of Philadelphia*, No. CV 18-1417, 2020 WL 3574454, at *7 n.4 (E.D. Pa. June 30, 2020) (citing *Estate of Oliva v. State of NJ*, 604 F.3d 788, 798 (3d Cir. 2010)).  "In doing so, the plaintiff 'must have acted under a good faith, reasonable belief that a [§ 1981] violation existed.'"  *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

The Court finds that Lara has adequately pleaded a claim of race-based retaliation under § 1981, Title VII, and the PHRA, as explained below.

---

[24]    There is some confusion in the case law as to what is needed to satisfy this prerequisite, which appears to be unique to the Third Circuit.  *See Anderson v. Boeing Co.*, No. CV 15-3073, 2016 WL 9446648, at *23 (E.D. Pa. Aug. 30, 2016) ("In a recent opinion, Judge Baylson discussed at some length the 'jurisdictional tension' that has resulted from the Third Circuit's statement in *Olivia. See Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 754-57 (E.D. Pa. 2014). Judge Baylson noted, for instance, that the Third Circuit is the only circuit court that requires plaintiffs to demonstrate an underlying § 1981 violation and that in subsequent nonprecedential opinions, the Third Circuit has cited Olivia without referencing the underlying-violation requirement."), *aff'd*, 694 F. App'x 84 (3d Cir. 2017); *Collins v. Kimberly-Clark Penn., LLC*, 247 F. Supp. 3d 571, 604-05 (E.D. Pa. 2017) (stating that "as a threshold matter, the plaintiff must demonstrate that there has been an underlying § 1981 race discrimination violation in a 1981 retaliation case"), *aff'd*, 708 F. App'x 48 (3d Cir. 2017) (citing *Estate of Oliva*, 604 F.3d at 798). However, this is of no moment:  As the Court has found that Lara has stated a claim for underlying disparate treatment discrimination under § 1981, he has met his burden.

First, Lara alleges that he opposed what he had a good faith belief was unlawful under each of these statutes:  race-based discrimination in the workplace.  Specifically, Lara attempted to report to multiple supervisors what he perceived to be (i) a discriminatory, race-based comment by a coworker, (ii) unequal enforcement of Sam Adams' zero-tolerance discrimination policy, supported by his observation that a non-white employee had been terminated for similarly making a race-based comment, and (iii) the general failure of supervisors to take his multiple reports seriously and their failure to institute corrective measures.  *See, e.g.*, ¶¶ 88, 92, 166, 185, 192, 197-98.

Second, as the Court has already established, it cannot be disputed that Lara suffered an adverse employment action in the form of his termination.  *See id.* ¶¶ 201-02.

Finally, from Lara's allegations, the Court can draw an inference of—or, at a minimum, reasonably expect that discovery will lead to evidence supporting—a causal connection between his multiple reports of perceived unlawful discrimination at Sam Adams and his ultimate termination.  In particular, a temporal connection exists between Lara's reports and his termination—he states he was terminated approximately two weeks after making his first report of alleged discrimination, and only two hours after making his final report, to Lewis Mars.  *See id.* ¶¶ 197-202; *see also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir.2007) ("In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection.").  Moreover, as previously discussed in the context of Lara's discrimination claim, of relevance is Lara's complete denial of having ever worn ear buds—the purported justification for his termination.  *See* Am. Compl. ¶¶ 201-03.

From these allegations, the Court is satisfied that Lara has adequately stated his claims of race-based retaliation in violation of § 1981, Title VII, and the PHRA.

### C.     Hostile work environment:  Lara has failed to sufficiently plead his claims

To state a hostile work environment claim under the relevant statutes, a plaintiff must adequately plead that:  "1) [the plaintiff] suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible].'"[25]  *Castleberry*, 863 F.3d at 263.  A court reviewing allegations in support of a claim of hostile work environment must evaluate "[t]he totality of the circumstances[, which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Suri v. Foxx*, 69 F. Supp. 3d 467, 480 (D.N.J. 2014) (*quoting Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993)).  As to severity, "not all conduct is actionable under a hostile work environment claim. 'The discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment. Unless they are extremely severe, offhand comments and isolated incidents are insufficient to sustain a

---

[25]     "Hostile environment claims are . . . not subject to the *McDonnell Douglas* burden shifting framework."  *Barnett v. Lowes Home Centers, LLC*, No. CV 18-2064, 2019 WL 1047496, at *10 (E.D. Pa. Mar. 5, 2019).  As discussed at length previously, application of the *McDonnell Douglas* framework—or, more accurately, non-application of the *McDonnell Douglas* framework in cases where *direct* evidence of discrimination is adduced—provides the justification for dispensing with the requirement of pleading the prima facie elements of discrimination and retaliation claims.  Because this framework does not apply to hostile work environment claims at the burden of proof stage, the more deferential standard applicable to discrimination and retaliation claims similarly does not apply to hostile work environment claims at the pleading stage.

hostile work environment claim.'" *Williams v. Mercy Health Sys.*, 866 F. Supp. 2d 490, 501 (E.D. Pa. 2012) (quoting *Woodard v. PHB Die Casting,* 255 F. App'x 608, 609 (3d Cir. 2007)). As to the final element—the existence of respondeat superior liability—"[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Castleberry*, 863 F.3d at 266 n.1 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 795 (1998)).

The Court finds that Lara has failed to allege facts capable of making out a claim of race-based hostile work environment, for two primary reasons:   (1) the conduct of which Lara complains is insufficiently severe or pervasive to support a hostile work environment claim; and (2) to the extent Lara alleges discriminatory conduct, such conduct constitutes discrete acts rather than a *series* of events capable of supporting a hostile work environment claim.  The Court elaborates on these reasons below.

First, although the Amended Complaint is replete with conclusory assertions that Defendants' discriminatory conduct was "severe" and "pervasive," *see, e.g*., Am. Compl. ¶¶ 74-75, 100, 201, the Court disagrees that the alleged conduct rises to this level.  The actions of which Lara complains can be distilled to the following: (i) the November 29, 2018 comment made by a white employee that "I am tired of HTSS hiring all these blacks and Puerto Ricans," *id*. ¶¶ 76-77, 80, and that employee's affirmation that she is a racist, *id.* ¶ 81; (ii) Moyer's dismissal of the comment as a "joke" and his comment that the employee has the right to be racist, *id.* ¶¶ 128-29; (iii) the "white hat," "yellow hat" identification system and the alleged de facto segregation in which it resulted, *see id*. ¶¶ 59-73; (iv) Lara's loss of hours and overtime hours, *id*. ¶¶ 158-60; (v) the fact that Moyer was outside of Defendant Bill's office when Lara

was making his report and that Moyer subsequently stated that it was "our word versus your word," *id*. ¶¶ 168-81; (vi) Lara's frustration with what he perceived as a general failure to take action on his complaints, *see id*. ¶ 166; and finally, (vii) Lara's ultimate termination on December 13, 2018, *see id*. ¶ 201.

In the Court's view, even assuming that these occurrences together possessed a racial component sufficient to satisfy the first element of Lara's hostile work environment claim, they do not constitute the kind of "extremely severe" conduct capable of supporting such a claim.  In particular, the period during which the complained-of conduct occurred was only approximately two weeks—from November 29, 2018, to December 13, 2018—and, moreover, none of the conduct was physically threatening or severely humiliating.  With the exception of his loss of hours and termination—which are addressed below—Lara's grievances are with Defendants' failure to take corrective action for a derogatory comment made by a coworker to other coworkers that Lara believes he was meant to hear, as well as a perceived general disrespect fostered by the "white hat" "yellow hat" system.[26]  As such, in the Court's view, Lara's allegations are insufficient to support his race-based hostile work environment claim.  *See, e.g., Mahan v. City of Philadelphia*, 296 F. Supp. 3d 712, 721 (E.D. Pa. 2017) ("[T]he Amended Complaint fails to allege any facts suggesting discrimination that was 'severe or pervasive' so as to make the [ ] work environment abusive or hostile. Plaintiff nowhere cites physically threatening or humiliating conduct or offensive utterances made to Plaintiff.  The allegation that Plaintiff was denied job transfers does not suggest the type of 'severe or pervasive'

---

[26]    Lara appears to concede this, as in his opposition to Defendants' motion, he states that "Defendants' argument ignores the pervasiveness of a segregated workforce and particularly a segregated workforce where one race is subjected to daily harassment and abuse."  Plaintiff's Memorandum in Opposition ("Pl.'s Opp'n.") [ECF No. 10] at 9.

discriminatory conduct that would create an abusive or hostile work environment as opposed to constituting discriminatory treatment."); *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 280 (3d Cir. 2001) ("Title VII is not violated by the mere utterance of an . . . epithet which engenders offensive feelings in an employee or by mere discourtesy or rudeness, unless [it is] so severe or pervasive as to constitute an objective change in the conditions of employment.") (internal quotation marks and citation omitted); *compare Hewitt v. BS Transportation of Illinois, LLC*, 355 F. Supp. 3d 227, 236 (E.D. Pa. 2019) (finding that a plaintiff's hostile work environment claim survived a motion to dismiss where the plaintiff alleged he "was subject to sexual advances 'at least once or twice a week,' an instance of sexual assault, and threats of violence that resulted in extreme emotional distress and economic loss").

As to the second reason that the Court finds Lara's hostile work environment claims fail, to the extent he grounds these claims on his alleged discriminatory and retaliatory loss of hours and ultimate termination, such events are discrete acts that cannot serve the purpose Lara desires. As the Supreme Court has explained, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (citation and quotation omitted) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."); *see Santee v. Lehigh Valley Health Network, Inc*., No. CIV.A. 13-3774, 2013 WL 6697865, at *7 (E.D. Pa. Dec. 19, 2013) ("Plaintiff's termination on June 30, 2010, however, is a discrete act and is not a component of a hostile work environment claim."); *Riddell v. Slippery Rock Univ.*, No. CIV A 04-108, 2006 WL 2773414, at *12 (W.D.

Pa. Sept. 25, 2006) ("Plaintiff's claims, however, are not hostile work environment claims. . . . The acts and events at issue are discrete acts and events which constitute instances in which defendant failed to promote plaintiff.").  Therefore, while Lara's allegations—in particular, his allegations regarding his termination—are sufficient to state claims based upon discrete acts of discrimination and retaliation, they cannot, without more, provide the basis for a claim of hostile work environment.

For the above reasons, Lara has failed to state a claim of hostile work environment under § 1981 or Title VII, and these claims are therefore dismissed.[27]

### D. Liability of Defendants beyond Sam Adams

Having found that Lara has successfully stated claims of race-based discrimination and retaliation in violation of § 1981, Title VII, and the PHRA, the Court must next address which of the Defendants beyond Sam Adams, if any, may be liable for these claims.[28]

With respect to HTTS, the staffing agency that placed Lara with Sam Adams, the relevant inquiry is whether Lara's allegations are sufficient to plausibly infer an employee-employer relationship such that HTTS may be held liable as Lara's "employer."  In the context of employment discrimination claims, "the common-law test" of agency as outlined in *Nationwide*

---

[27]     Because Lara has failed to state a claim, the issue of whether he has plausibly alleged respondeat superior liability is moot.  *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (explaining that "[t]he first four elements [of the claim] establish a hostile work environment, and the fifth element [respondeat superior liability] determines employer liability").  However, even assuming Lara's allegations adequately stated a hostile work environment claim, it is questionable whether these allegations would sufficiently allege respondeat superior liability.  In particular, the derogatory comment at the heart of Lara's suit—"I am tired of HTSS hiring all these blacks and Puerto Ricans"—was made by Lara's  coworker rather than a supervisor.

[28]     As noted previously, the Court finds that for the purposes of Defendants' motion, based upon the facts alleged, Lara has adequately pleaded an employee-employer relationship with Sam Adams.  *See* footnote 19, *supra*.

*Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) governs the issue.  *Faush v. Tuesday Morning,*

*Inc.*, 808 F.3d 208, 213 (3d Cir. 2015).  Under this test, a court is to consider the following non-

exhaustive factors:

> the skill required; the source of the instrumentalities and tools; the location of the
> work; the duration of the relationship between the parties; whether the hiring party
> has the right to assign additional projects to the hired party; the extent of the hired
> party's discretion over when and how long to work; the method of payment; the
> hired party's role in hiring and paying assistants; whether the work is part of the
> regular business of the hiring party; whether the hiring party is in business; the
> provision of employee benefits; and the tax treatment of the hired party.

*Id*. at 214 (quoting *Darden,* 503 U.S. at 323).  Importantly, "[u]nder this inquiry, 'two entities

may be "co-employers" or "joint employers" for purposes of Title VII' where both

employee/employer relationships satisfy the relevant factors."  *Rippy v. Philadelphia Dep't of*

*Pub. Health*, No. CV 19-1839, 2019 WL 4849439, at *4 (E.D. Pa. Sept. 30, 2019) (quoting

*Faush*, 808 F.3d at 214).

Applying the above test to Lara's allegations, the Court observes the following.  Beyond

(1) the fact that he was placed at Sam Adams by HTTS and (2) the conclusory assertion that Sam

Adams and HTTS were his "joint and sole employer," Am. Compl. ¶ 29, the only substantive

averment Lara makes with respect to HTTS is his claim that he "was hired by and received a

paycheck from HTSS, Inc., however, the day to day assignments and job responsibilities Plaintiff

carried out were controlled by Samuel Adams," *id*. ¶ 31.  These allegations are thin indeed.

What is more, none of the alleged conduct supporting Lara's discrimination and retaliation

claims in any way implicates any agent or employee *of HTTS*; to the contrary, Lara's grievances

concern the conduct of Sam Adams employees exclusively.  And yet, for several reasons, at this

stage of the litigation the Court declines to find that HTTS was not Lara's "employer" under the

applicable legal standard.

First, Lara does allege that he was paid by HTTS, a significant factor in itself. *See Prather v. Prudential Fox & Roach*, 326 F. App'x 670, 672 (3d Cir. 2009). Second, it is likely that discovery will produce evidence capable of supporting a claim of an employee-employer relationship between Lara and HTTS. Additionally, giving him the benefit of the doubt, the Court assumes that it was not Lara's intention to plead his case in a manner that would foreclose liability against HTTS. In the Court's view then, the ultimate determination of whether HTTS and/or Sam Adams is properly considered Lara's "employer" under the common law of agency is better addressed on summary judgment or at trial after discovery has taken place. *See, e.g.*, *Shah v. Bank of Am.*, 598 F. Supp. 2d 596, 600 (D. Del. 2009), *aff'd*, 346 F. App'x 831 (3d Cir. 2009); *Yue Yu v. McGrath*, 597 F. App'x 62 (3d Cir. 2014). Accordingly, the Court finds that Lara has adequately pleaded his claims of race-based discrimination and retaliation against HTTS in addition to Sam Adams.

The Court next turns to the seven individual Defendants—Kevin Moyer, Edwin (last name unknown), Quincy Troupe, Derrick (last name unknown), Bill (last name unknown), Alison Glen, and Lewis Mars—and the issue of whether they may be held liable for Lara's claims of race-based discrimination and retaliation under § 1981, Title VII, and the PHRA.

The answer with respect to Lara's Title VII claims is clearly no. "Congress did not intend to hold individual employees liable under Title VII." *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1078 (3d Cir. 1996). "As a result, the individually-named [D]efendants cannot be held liable for violations of Title VII." *Hamilton v. Genesis Healthcare Corp.*, No. CV 17-4777, 2018 WL 741724, at *4 (E.D. Pa. Feb. 7, 2018). Lara's Title VII discrimination and retaliation claims against these individuals are therefore dismissed.

As for Lara's § 1981 claims, the Third Circuit "has found individual liability under § 1981 'when [the defendants] intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable.'" *Shaw v. Temple Univ.*, 357 F. Supp. 3d 461, 474 (E.D. Pa. 2019) (quoting *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001)).

Under this standard, Lara has failed to adequately plead facts that would implicate liability for any of the seven individual Defendants.   Even liberally construing the Amended Complaint with respect to these Defendants, the allegations describe (1) a limited number of workplace interactions with which Lara was offended, and (2) a general failure of the individuals to whom he reported perceived discrimination to take action he thought appropriate and within a time frame he desired.  In the Court's view, the heart of Lara's suit deals with what he alleges to be his discriminatory and retaliatory termination.  There are insufficient allegations to tie this action—his termination—to any unlawful conduct on behalf of the individual Defendants. While Lara's allegations may be (and are) sufficient to state claims of race-based discrimination and retaliation against his employer(s), they are insufficient to subject any of the seven individuals to liability under § 1981.  Lara's claims under § 1981 against the individual Defendants are therefore dismissed.

Finally, the Court turns to whether Lara has adequately pleaded facts that support individual liability for his claims under the PHRA.  "The PHRA allows individual supervisors to be held liable for aiding and abetting an employer's violation of the PHRA under 43 P.S. § 955(e). *Dici v. Pennsylvania,* 91 F.3d 542, 552–53 (3d Cir.1996). Furthermore, a supervisory employee may also be found liable for direct acts of discrimination under § 955(e) if the supervisor shared the intent and purpose of his employer." *Merces-Clark v. Pennsylvania*, No.

CIV.A. 13-02111, 2013 WL 6096324, at *3 (E.D. Pa. Nov. 19, 2013) (citing *Santai v. Fred Beans Ford, Inc.,* No. 10–2367, 2011 WL 3606836, *2-4 (E.D. Pa. Aug.16, 2011), *Bernhard v. Brown & Brown of Lehigh Valley, Inc.,* 720 F. Supp. 2d 694, 705–06 (E.D.Pa.2008), *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C.,* 20 F. Supp. 2d 885, 887 (E.D. Pa.1998), and *Glickstein v. Neshami ny School District,* Civ. A. No. 96–6236, 1997 WL 660636, *11-13 (E.D. Pa. Oct.22, 1997)).

For the same reasons that Lara fails to adequately plead individual liability under § 1981, the Court finds that he has failed to allege facts showing that any of the seven individual Defendants were responsible for either direct acts of discrimination or for aiding and abetting Sam Adams' alleged discriminatory conduct under the PHRA. The factual averments with respect to the individual Defendants are insufficient to plausibly support an inference of individual responsibility for unlawful discrimination or retaliation. Lara's PHRA claims of race-based discrimination and retaliation against the individual Defendants are therefore dismissed.

## V.      CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss the Amended Complaint is granted, in part, and denied in part. The motion is granted as to Lara's hostile work environment claims against all Defendants. The motion is also granted as to Lara's race-based discrimination and retaliation claims against the seven individual Defendants. The motion is denied as to his race-based discrimination and retaliation claims against Sam Adams and HTTS.

A separate Order follows this Opinion.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge